```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
MICHELE FLANAGAN,

                        Plaintiff,

            -against-                          MEMORANDUM & ORDER
                                               11-CV-2682(JS)(GRB)
GEICO GENERAL INSURANCE COMPANY, GEICO
CORPORATION, GEICO INDEMNITY COMPANY,
and GEICO CASUALTY COMPANY

                        Defendants.
----------------------------------------X
APPEARANCES
For Plaintiff:      Scott M. Mishkin, Esq.
                    Kyle T. Pulis, Esq.
                    Scott Michael Mishkin, P.C.
                    One Suffolk Square, Suite 520
                    Islandia, NY 11749

For Defendants:     Barry I. Levy, Esq.
                    Kenneth Adam Novikoff, Esq.
                    Rivkin Radler LLP
                    926 RXR Plaza
                    Uniondale, NY 11556

                    Bruce S. Harrison, Esq.
                    Shawe & Rosenthal LLP
                    20 South Charles Street, 11th Floor
                    Baltimore, MD 21201
```

SEYBERT, District Judge:

Plaintiff Michele Flanagan ("Plaintiff") commenced this employment discrimination action against defendants GEICO General Insurance Company, GEICO Corporation, GEICO Indemnity Company, and GEICO Casualty Company (collectively, "GEICO"), alleging claims of hostile work environment and retaliation in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. EXEC. LAW § 290 et seq.

Currently pending before the Court is GEICO's motion for summary judgment. (Docket Entry 66.) For the following reasons, GEICO's motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND[1]

Plaintiff is currently employed by GEICO as a Senior Claims Examiner in the Continuing Unit Department of GEICO's Liability Claims Division. She has worked for GEICO since 1986. In this action, Plaintiff claims that beginning in 2005, she was sexually harassed by a non-supervisory co-worker, Michael Meehan ("Meehan"). (See Pl.'s 56.1 Stmt., Docket Entry 61, ¶¶ 148-50.) Plaintiff alleges that Meehan regularly stared at her feet and chest; graphically described acts of masturbation and sex; made comments about her underwear and breasts; asked her to describe how she masturbates; and told her that he would masturbate while thinking about her. (See Pl.'s 56.1 Stmt. ¶ 150.) GEICO does not dispute that Meehan engaged in this conduct.

Between 2005 and 2008, Plaintiff reported Meehan's conduct to four different "managers and/or supervisors." However, Plaintiff claims that they all failed to take appropriate action to stop Meehan's behavior. Plaintiff first complained to Myra Mayer ("Mayer") in 2005. (Pl.'s 56.1 Stmt. ¶ 158.) Plaintiff

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and their affidavits and evidence in support. Any factual disputes will be noted.

2

told Mayer that Meehan regularly stared at her chest, described acts of masturbation, and made comments about her underwear. (Flanagan Dep. Tr., Docket Entry 68-2, 344-45.) According to Plaintiff, in response, Mayer "comment[ed] on how disgusting [Meehan's conduct] was" and told Plaintiff that she should talk to her direct supervisor, Paul Lucas ("Lucas"). (Flanagan Dep. Tr. 346:8-10, 346:14-15, 347:24-25.) During her deposition, Plaintiff testified that she subsequently discussed Meehan's conduct with Mayer on at least three or four additional occasions in 2006 and 2007, (Flanagan Dep. Tr. 349:13-19), and that she also reported Meehan's conduct to Lucas in 2005 and 2007, (Flanagan Dep. Tr. 415). However, Plaintiff conceded that she would not repeat to Lucas exactly what Meehan said to her. (Flanagan Dep. Tr. 428-30.) There is no evidence that anyone took any action at this point to stop Meehan's conduct, which then allegedly continued until early 2008.

On February 2, 2008, Plaintiff asked Julie Waugh ("Waugh"), a supervisor in her department, if she wanted to order Chinese food with her. (Pulis Decl., Docket Entry 72, Ex. V, Docket Entry 72-5, at 31[2].) According to an office memorandum Waugh later prepared, Waugh mentioned Meehan's name since he usually ordered Chinese food for other associates in the

---

[2] Page numbers of exhibits referenced herein refer to the page numbers supplied by the Electronic Case Filing system.

3

department. (Pulis Decl. Ex. V.) Plaintiff then told Waugh that Meehan was "out of control with the things he ha[d] been saying" and that "he told her he thought about her when he masturbated." (Pulis Decl. Ex. V.) Waugh asked Plaintiff if she wanted her to speak to Meehan without revealing Plaintiff's name. (Pulis Decl. Ex. V.) Plaintiff said "OK," and Waugh told Plaintiff that she could "also go to H.R. directly." (Pulis Decl. Ex. V.) Two days later, Waugh "had a conversion with . . . Meehan regarding the[ ] inappropriate comments." (Pulis Decl. Ex. V.) Waugh did not "reveal [Plaintiff's] name nor any of the specifics of the comments," but she "advised [Meehan] that the[ ] comments [could] be considered sexual harassment and he could possibly be fired for making them." (Pulis Decl. Ex. V.) According to Waugh, Meehan "understood the seriousness of this and [she] believed the matter was resolved." (Pulis Decl. Ex. V.)

However, things escalated in March 2008 when Meehan blocked Plaintiff in her cubicle and began talking about masturbation and sex. (Flanagan Dep. Tr. 445:13-18.) Plaintiff immediately reported the incident to Waugh. According to Plaintiff, Waugh advised her that she spoke to Charlie Capo ("Capo"), a manager in their department, about the earlier incidents and that Plaintiff "should go to Charlie." (Flanagan Dep. Tr. 448:9-14.) Thereafter, Plaintiff and Debbie Schmidt ("Schmidt"), a female co-worker whom Meehan also allegedly

4

harassed, went to Capo's office together to report Meehan's conduct. (Flanagan Dep. Tr. 451.)

The record is not entirely clear, but it appears that on March 27, 2008, Plaintiff orally reported Meehan's conduct to the Human Resources Department and then followed up with a written statement describing Meehan's conduct that same day. (See Flanagan Dep. Tr. 457; Pulis Decl., Ex. Q, Docket Entry 72-5, at 9-11.) Schmidt and Nancy Melillo ("Melillo"), another female co-worker, also provided written statements describing Meehan's conduct towards them. (Pulis Decl. Exs. S & T, Docket Entry 72-5, at 24-25, 27.) According to Schmidt's statement, Meehan, "[k]nowing that [Schmidt] was on a diet," told her "not to lose weight on the top because that is just perfect." (Pulis Decl. Ex. S.) He also told her that "when [she] wear[s] a certain red shirt," she did not "want to know what he does at home when he thinks of [her] in that shirt." (Pulis Decl. Ex. S.) Similarly, Melillo claimed that she experienced lewd behavior from Meehan for years, including that he asked her to let him know if she went topless to the beach and whether she slept naked. (Pulis Decl. Ex. T.)

Rosemary Mahler ("Mahler"), the Director of Human Resources, assigned Maureen Natalie ("Natalie"), a Compliance Administrator in Human Resources, to investigate the complaints against Meehan. During the course of the investigation, Meehan admitted to making sexual comments to Plaintiff. (Natalie Dep.

5

Tr., Docket Entry 72-3, 37:20-21, 56:5-6.) According to Natalie, Meehan "said he thought it was okay because of [his and Plaintiff's] bantering." (Natalie Dep. Tr. 37:20-21.) At the conclusion of the investigation, Mahler and Natalie concluded that sexual harassment had taken place and, on April 1, 2008, issued a written warning to Meehan stating that any future harassment would "result in further disciplinary action up to and including termination of employment." (Pulis Decl. Ex. DD, Docket Entry 72-6, at 22.) Plaintiff asked that Meehan's workstation be moved to area away from hers, but her request was denied. According to a memorandum Natalie prepared in connection with her investigation, "it was determined that the best course of action would be to leave [Meehan] in his seat and move [Plaintiff]. . . . [because Meehan's] location [was] directly outside the manager's office where he [could] be kept under watchful eye." (Pulis Decl. Ex. GG, Docket Entry 72-6, at 30.) At her deposition, Mahler testified that they decided to issue a warning, and not something more severe, in part because Meehan "was never advised he could be terminated for [the conduct] and because he believed he was included in some of the[ ] conversations that they were having while at work." (Mahler Dep. Tr., Docket Entry 72-2, 72:20-73:6.) She further testified that "[a]ny violation of that warning would have been immediate dismissal." (Mahler Dep. Tr. 73:5-6.)

6

On April 2, 2008, Plaintiff sent Natalie and Mahler a written statement objecting to the denial of her request that Meehan's workstation be moved. (Pulis Decl. Ex. FF, Docket Entry 72-6, at 26-28.) According to Plaintiff, she declined management's offer to move her workstation, because the cubicle she was offered was smaller than her current location and "not near the other associates that [she] worked with in [her] group." (Flanagan Aff., Docket Entry 72-4, ¶ 123.) Plaintiff claims that this "would have been inconvenient for [her and her associates]." (Flanagan Aff. ¶ 124.) Plaintiff placed two additional requests to have Meehan moved with Marc Auerbach ("Auerbach"), the then-Director of her department, but both requests were denied. (Pl.'s 56.1 Stmt. ¶¶ 225-26, 238-39.) Plaintiff alleges that she received conflicting reasons for management's decision not to move Meehan. She claims that Auerbach told her that management did not want to "expose him to more people," (Flanagan Dep. Tr. 481:5-7), but that Capo told her the reason was that Meehan "thought that [he and Plaintiff] were friends . . . , that [their conversations] were consensual . . . , and [that] he was just joking around with [Plaintiff]," (Flanagan Dep. Tr. 482:13-17).

Later that year, in December 2008, Seth Ingall ("Ingall"), GEICO's Regional Vice President, entered Plaintiff's cubicle, put his chin on Plaintiff's head and, while breathing heavily, said "I just want one quote" over and over, which

7

apparently was a reference to an employee incentive program. (Flanagan Dep. Tr. 226-233.) Plaintiff testified that this incident lasted five to six seconds. (Flanagan Dep. Tr. 231:25.) Sometime in January 2009, Plaintiff reported the incident as "creepy" to Jeremy Connor ("Connor"), the then-Director of her department. (Flanagan Dep. Tr. 238, 249.) Plaintiff testified that during their conversation, Connor told Plaintiff that Ingall would sometimes stand behind him and play with his ear, and that he would talk John Pham ("Pham"), the Assistant Vice President of Claims, about the incident between Ingall and Plaintiff. (Flanagan Dep. Tr. 254-55.) Plaintiff claims that she followed up with Connor a few weeks later and he advised her that he had not spoken to Pham. (Flanagan Dep. Tr. 257.) Pham, however, allegedly made light out of the complaint--one day in the elevator with Plaintiff and Ingall, Pham started muttering "creepy creepy." (Flanagan Dep. Tr. 290.) Plaintiff claims that Ingall asked Pham what he was saying, and Plaintiff responded, "He's calling you creepy. You walked into my cubicle, put your chin on my head and breathed all over me to get me to do a case for quote. It was plain creepy." (Flanagan Aff. ¶ 143.)

Roughly three months later, Plaintiff was transferred to a new group headed by Kevin Cronin ("Cronin"), where Plaintiff claims, among other things, she "was held to a higher standard . . . and subjected to increased scrutiny and supervision

8

by Cronin." (Flanagan Aff. ¶ 161.) At her deposition, Plaintiff testified that her claim is that Ingall made the decision to transfer Plaintiff to Cronin's group in retaliation for her complaint against him, although she admitted that this contention is based solely on her own speculation. (Flanagan Dep. Tr. ¶ 272:24-273:8.)

Sometime in May 2009 and 2010, Plaintiff again complained to Human Resources about Meehan--this time, Meehan was inappropriately staring and growling at Plaintiff. (Pl.'s 56.1 Stmt. ¶ 278.) Sometime thereafter, management decided to move Meehan's workstation. (Natalie Dep. Tr. 100.)

Finally, Plaintiff alleges that in February 2010, there was another incident with Ingall. According to Plaintiff, Ingall was on an elevator with Plaintiff, Schmidt, and another female employee. (Flanagan Dep. Tr. 294.) Plaintiff and Schmidt forgot to press the button for their floor, and Schmidt said something to the effect of, "I can go up to your office, there's enough room in there." (Flanagan Dep. Tr. 295:13-296:5.) Ingall responded, "Don't worry. My office is big enough for all four of us." (Flanagan Dep. Tr. 296:6-9.) At her deposition, Plaintiff testified that she "shot [Ingall] a look [and] he made like a blushing face." (Flanagan Dep. Tr. 297:15-15.)

During the relevant time period, GEICO maintained a "Fair Workplace Policy" that defines and prohibits sexual

9

harassment. (See Pulis Decl. Ex. W, Docket Entry 72-5, at 33, Ex. AA.) The policy states that sexual harassment "is illegal" and "forbidden" and violates GEICO's policy. (Pulis Decl. Ex. W.) It defined sexual harassment as follows:

> Sexual harassment includes, but is not limited to, unwelcome physical, written or spoken conduct of a sexual nature by either a supervisor or a fellow associate which interferes with an individual's work performance or creates what a reasonable person would consider to be an intimidating, hostile, or offensive work environment. This includes insinuations, promises or threats relating to requests or demands for sexual favors, whether or not those threats or promises are carried out. Sexual harassment may include verbal, written or physical conduct of a sexual nature engaged in by a person of the same sex as well as of the opposite sex. Comments or behavior which intimidate, ridicule or demean an associate's status based on gender may also constitute sexual harassment.

(Pulis Decl. Ex. W.) It further states that "[e]ach supervisor and manager must ensure that . . . associates are treated in a fair and nondiscriminatory manner in all terms of conditions of employment." (Pulis Decl. Ex. W.)

GEICO provided several mechanisms for reporting harassment. For example, GEICO's "Preventing Sexual Harassment" manual states:

> If any associate believes he/she has not been treated fairly, they are encouraged to immediately report the matter.

10

> Associates may speak to their supervisor, manager or planning center manager about any situation. An associate may also speak to the Human Resources Manager in their business location or to the following staff located at GEICO Plaza: A member of Plaza Human Relations, the Human Relations Manager, the Assistant Vice President of Human Resources or the Vice President of Human Resources.

(Pulis Decl. Ex. AA, Docket Entry 72-6, at 8.) Additionally, GEICO's Code of Conduct provides three avenues for reporting violations of "GEICO policies." (Pulis Decl. Ex. II, Docket Entry 72-6, at 37.) Of relevance here, the Code of Conduct states that an employee can "[d]iscuss any problem with [his or her] supervisor or manger unless this seems inappropriate" or "[u]se the GEICO Open Door Policy to discuss the problem with the next higher level of management or any member of management and/or human resources, corporate human relations, general counsel or internal audit if this level of management is more appropriate." (Pulis Decl. Ex. II at 37.) Finally, GEICO's internal reporting procedures require "[a]ny supervisor or manager who receives a complaint of violence, threats, harassment, or property damage [to] notify their Planning/Profit Center Manager, their Human Resources Department, and the Corporate Human Relations Department at the Plaza." (Pulis Decl. Ex. X, Docket Entry 72-5, at 35.)

Plaintiff commenced this action in state court in June 2011, asserting claims against GEICO under the NYSHRL for

11

retaliation and hostile work environment.[3] The action was removed to this Court on the basis of diversity jurisdiction. GEICO now moves for summary judgment. (Docket Entry 66.)

## DISCUSSION

The Court will first set forth the applicable legal standards before turning to GEICO's motion more specifically.

I. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary

---

[3] Plaintiff's Complaint actually labels her claim as a "discrimination" claim. However, a fair reading of the allegations of the Complaint demonstrate that Plaintiff is asserting a hostile work environment claim, and neither party really disputes this. (See, e.g., Defs.' Br., Docket Entry 69, at 21-25 (addressing Plaintiff's claim as one alleging a hostile work environment).) Accordingly, the Court construes the Complaint to assert a claim of hostile work environment based on sexual harassment.

12

judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice." (citation omitted)); Weinstock, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact.").

## II. Hostile Work Environment

Plaintiff seeks to hold GEICO liable for subjecting her to a hostile work environment under the NYSHRL based on Meehan's alleged sexual harassment. (See Pl.'s Opp. Br., Docket Entry 71, at 3-16.) GEICO argues that it is entitled to summary judgment,

13

arguing that it cannot be held vicariously liable for any alleged harassment by Meehan towards Plaintiff. (See Defs.' Br. at 21-25.)  As discussed below, the Court disagrees, because there are disputed issues of material fact regarding whether Meehan's conduct may be imputed to GEICO.[4]

"[I]n order to establish employer liability under . . . the NYSHRL for hostile actions taken by employees, a plaintiff must establish that the hostile work environment can be imputed to the employer."  Setelius v. Nat'l Grid Elec. Servs. LLC, No. 11-CV-5528, 2014 WL 4773975, at *25 (E.D.N.Y. Sept. 24, 2014).  "Under the NYSHRL, an 'employer cannot be held liable . . . for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.'"  E.E.O.C. v. Suffolk Laundry Servs., Inc., --- F. Supp. 3d ----, 2014 WL 4920178, at *19 (E.D.N.Y. Oct. 1, 2014) (quoting Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 311, 786 N.Y.S.2d 382, 395, 819 N.E.2d 998, 1011 (2004)).  Affirmative discriminatory action by the employer is not required. "'Condonation, which may sufficiently implicate an employer in the discriminatory acts of its employee to constitute a basis for

---

[4] GEICO does not contest Plaintiff's claim that Meehan sexually harassed her and subjected her to a hostile work environment. Thus, for the purposes of this motion, the Court assumes that Plaintiff has established that she was harassed and subjected to a hostile work environment.

14

employer liability under the Human Rights Law, contemplates a knowing, after-the-fact forgiveness or acceptance of an offense.'" Id. (quoting State Div. of Human Rights ex rel. Greene v. St. Elizabeth's Hosp., 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411, 412, 487 N.E.2d 268, 269 (1985)). "'An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation.'" Clark v. City of N.Y., No. 13-CV-0210, 2014 WL 4804237, at *4 (E.D.N.Y. Sept. 25, 2014) (quoting Greene, 66 N.Y.2d at 687, 496 N.Y.S.2d at 412, 487 N.E.2d at 269).

GEICO argues that it cannot be held liable for Meehan's conduct because Plaintiff did not file a complaint with Human Resources until March 2008, and that upon receipt of the complaint, Human Resources immediately undertook an investigation and disciplined Meehan. (Defs.' Br. at 22.) However, there is evidence suggesting that in 2005, 2006, and 2007, Plaintiff complained about Meehan's conduct to at least one supervisor, Mayer, and that she did nothing, even though she had a responsibility under GEICO's policies to report complaints to Human Resources.

Additionally, the Court finds that there are disputed issues of material fact relating to adequacy of the response to the complaint Plaintiff filed with Human Resources. Human Resources concluded that Meehan sexually harassed Plaintiff, but only issued a warning in part because Meehan "was never advised he

15

could be terminated for [the conduct] and because he believed he was included in some of their conversations that they were having while at work." (Mahler Dep. Tr. 72:20-73:6.) Moreover, Plaintiff claims that Auerbach told her that management did not want to move Meehan's desk because it might "expose him to more people." (Flanagan Dep. Tr. 481:5-7.) Capo allegedly told Plaintiff that management would not move Meehan because Meehan "thought [he and Plaintiff] were friends . . . , [their] conversations] were consensual . . . , and he was just joking around with [Plaintiff]," (Flanagan Dep. Tr. 482:13-17). Viewing this evidence in the light most favorable to Plaintiff, a rational jury could conclude that certain supervisors condoned Meehan's behavior. Accordingly, summary judgment on Plaintiff's hostile work environment claim is DENIED.

III. Retaliation

The NYSHRL "make[s] it unlawful for an employer to retaliate against an employee because that employee has made a charge or complaint of discrimination." Carter v. Verizon, No. 13-CV-7579, 2015 WL 247344, at *13 (S.D.N.Y. Jan. 20, 2015). Here, the basis of Plaintiff's retaliation claim is that Ingall orchestrated her transfer to a new group headed by Cronin in retaliation for complaining about his interaction with her in December 2008. (Flanagan Dep. Tr. 272-73.) As discussed below, summary judgment is warranted on Plaintiff's retaliation claim

16

because she has failed to establish a prima facie case of retaliation.

A retaliation claim under the NYSHRL is analyzed using the burden-shifting framework articulated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in McDonnell Douglas . . . governs retaliation claims under . . . the NYSHRL.") That framework requires a plaintiff to first establish a prima facie case, after which the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). To establish a prima facie case of retaliation, a plaintiff must show that: "'(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.'" Summa, 708 F.3d at 125 (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 (2d Cir. 2006)).

Plaintiff has failed to establish a prima facie case. As an initial matter, during her deposition, Plaintiff conceded that her assertion that Ingall orchestrated her transfer to Cronin's group was based solely on her own speculation. Thus, her

17

claim that there is a causal connection between her transfer and her complaint is tenuous.

But more importantly, the Court finds that Plaintiff cannot establish that she engaged in a protected activity when she complained about her interaction with Ingall. To prove that she engaged in a protected activity, Plaintiff "need not establish that the conduct [she] opposed was in fact a violation of [the law]." Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988). Rather, Plaintiff need only have a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Id. (internal quotation marks and citation omitted). However, Plaintiff "cannot merely show that she subjectively believed her employer was engaged in unlawful employment practices, but also must demonstrate that her belief was objectively reasonable in light of the facts and record presented." Lown v. Salvation Army, Inc., 393 F. Supp. 2d 223, 255 (S.D.N.Y. 2005) (emphasis in original) (internal quotation marks and citation omitted)).

Here, under an objective standard, Plaintiff could not have reasonably believed that she was opposing sexual harassment or a hostile work environment when she complained about her interaction with Ingall in December 2008. During her deposition, Plaintiff testified that Ingall entered Plaintiff's cubicle, put his chin on her head and, while breathing heavily, said "I just

18

want one quote" over and over.  (Flanagan Dep. Tr. 226-233.) Plaintiff testified that this incident lasted five to six seconds. (Flanagan Dep. Tr. 231:25.)  This brief, non-sexual and isolated act of touching cannot form a reasonable belief that Plaintiff was opposing sexual harassment or a hostile work environment. Accordingly, GEICO's motion for summary judgment as to Plaintiff's retaliation claim is GRANTED.

## CONCLUSION

For the foregoing reasons, GEICO's motion for summary judgment (Docket Entry 66) is GRANTED IN PART and DENIED IN PART. Summary judgment is granted as to Plaintiff's retaliation claim and denied as to Plaintiff's hostile work environment claim.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    March   31  , 2015
          Central Islip, New York